MAC S. HUDSON *vs.* COMMISSIONER OF CORRECTION &
others.[1]

No. 97-P-1027.

Suffolk. October 15, 1998. - March 29, 1999.

Present: LAURENCE, KAPLAN, & RAPOZA, JJ.

Further appellate review granted, 430 Mass. 1102 (1999).

*Imprisonment,* Enforcement of discipline, Transfer of prisoner. *Due Process of
Law,* Prison disciplinary proceedings. *Protective Order.*

A Superior Court judge correctly ordered summary judgment in favor of
defendant correction officials on an inmate's claims of alleged deprivation
of rights by virtue of restrictive confinement and alleged defects in the
disciplinary process, where, in the circumstances, the inmate had received
all the process due under applicable regulations and State and Federal
constitutional standards. [541-549]

CIVIL ACTION commenced in the Superior Court Department on
July 23, 1996.

The case was heard by *Thayer Fremont-Smith,* J., on motions
for summary judgment.

*Richard C. McFarland* for the defendants.

*Mac S. Hudson,* pro se.

LAURENCE, J. Mac S. Hudson, an inmate serving his sentence
at the Massachusetts Correctional Institution at Cedar Junction
(MCI, Cedar Junction),[2] was subjected to restrictive confine-
ment and a prison disciplinary proceeding in June, 1996, on a
charge of fighting with another inmate. The proceeding resulted
in a finding that Hudson was guilty of assaulting the other

---

[1]Ronald T. Duval, superintendent of Massachusetts Correctional Institution
at Cedar Junction (MCI, Cedar Junction), and Mark Powers, deputy
superintendent of M.C.I., Cedar Junction. Michael Devine, Robert Bailer, and
Ernest Therien, employees of M.C.I., Cedar Junction, are also named as
defendants.

[2]The record does not reveal what Hudson's sentence was or of what crimes
he was convicted.

inmate and a sanction of loss of television, radio, canteen, and telephone privileges for two weeks, suspended for sixty days. He continued in restrictive confinement until July 23, 1996. On that date, Hudson commenced an action in the nature of certiorari, pursuant to G. L. c. 249, § 4, against the named defendants in Superior Court challenging his prison disciplinary process. His complaint also sought declaratory relief under G. L. c. 231A, § 1, damages under 42 U.S.C. § 1983, and an order for civil contempt (see note 5, *infra*), all on account of the defendants' alleged deprivation of his rights by virtue of the restrictive confinement and defects in the disciplinary process. After a hearing on cross motions for summary judgment, a Superior Court judge allowed the defendants' motion as to all of Hudson's claims and ordered entry of final judgment for the defendants. In his appeal, Hudson challenges the Superior Court's ruling as erroneous on a number of grounds. We conclude that none of his contentions presents a ground for reversal and affirm.

The essential facts underlying this controversy are undisputed.[3] As of June 1, 1996, Hudson was residing in a cell in a general population unit of the prison called "Essex II." On that date, he and another inmate, Antwine, were placed on "awaiting action" status in Essex II[4] in connection with an investigation of an apparent bloody altercation in or about a stairwell of the unit earlier in the day. Three days later, on June 4, 1996,

---

[3]See note 5, *infra*.

[4]" 'Awaiting action' constitutes a status in which an inmate may be placed pending a disciplinary hearing, an investigation of a possible disciplinary offense, a transfer or reclassification, or imposition of isolation time sanction when the inmate's continued presence in the general population poses a serious threat. See [103 Code Mass. Regs.] § 430.19(1) [(1978)]. When placed in 'awaiting action' status, an inmate may be confined to an area or areas designated by the superintendent . . . . Such confinement is administrative segregation." *Lamoureux* v. *Superintendent, Mass. Correctional Inst., Walpole*, 390 Mass. 409, 411-412 n.7 (1983). See *Royce* v. *Commissioner of Correction*, 390 Mass. 425, 429-430 (1983). The applicable form of the "awaiting action" regulation as of the date of Hudson's difficulties was 103 Code Mass. Regs. § 430.21(1) (1993), which stated that "[a]t the discretion of the Superintendent or his designee . . . an inmate who is under investigation for a possible disciplinary offense or has been charged with or found guilty of a disciplinary offense, may be placed on awaiting action status at the institution where he is then confined. Such status may include more restrictive confinement as deemed appropriate by the Superintendent or his designee." Hudson has not challenged the validity of any correctional regulations in this proceeding.

Hudson was transferred to the more restrictive "Essex I" unit of the prison and was formally notified that he had been placed on "awaiting action/pending investigation" status in connection with his role in a June 1 assault on Antwine and his suspected involvement in a subsequent assault on Antwine on June 4[5] by several other inmates in the Essex II unit.

On June 11, 1996, a disciplinary report was issued to Hudson alleging that he had assaulted inmate Antwine on June 1, 1996, and was implicated in the subsequent June 4, 1996, assault on Antwine. Those incidents were stated to constitute offenses contrary to 130 Code Mass. Regs. §§ 430.24(2), (8), (18) (1993) (violating prison rules or regulations; interfering with or disrupting the security or the orderly running of the prison; fighting with or assaulting another person). A disciplinary hearing was scheduled for June 19, 1996.

Prior to the hearing, Hudson requested that he receive certain

---

[5]Hudson repeatedly asserts that summary judgment for the defendants was inappropriate because of a material disputed fact: whether he was transferred to Essex I on June 4 before or after the assault on Antwine that day. Hudson argues that the transfer to a more restrictive unit prior to the second assault not only removed him from awaiting action status to a disciplinary segregation unit but also violated a court order issued on January 5, 1996, in Gilchrist vs. DuBois, Superior Court Civ. No. 93-6300-D, which he construes as requiring the provision of various due process protections prior to a transfer to more restrictive confinement. (This supposed violation of the Gilchrist order is also the basis for Hudson's claim that the defendants should be held in contempt.) As the Commonwealth correctly points out, however, the regulation, 103 Code Mass. Regs. § 430.21(1), cited immediately above in note 4, expressly authorized such a transfer; to the extent process was due, he received it within fifteen days as required by the regulations. See 103 Code Mass. Regs. § 421.08(3) (1994). Cf. 103 Code Mass. Regs. § 430.22(2) (1993); G. L. c. 127, § 40. Moreover, at the time of Hudson's transfer, the original injunctive order in Gilchrist applied only to inmate Gilchrist himself and was not amended to apply to other prisoners until August 19, 1996, eleven weeks after Hudson's transfer. (That latter fact alone disposes of Hudson's claim for a contempt sanction.) Further, Gilchrist vs. DuBois involved (as the judge below observed) a so-called "phase system" under which Gilchrist was transferred to more restrictive confinement, without notice or hearing, "pursuant to a routine evaluation of his 'overall adjustment to maximum security' " and not, as was Hudson, pursuant to the express authority of the awaiting action regulation and the need to investigate a serious, violent incident in which Hudson was the prime suspect. The judge thus effectively determined that the supposed factual dispute was not material to the gravamen of Hudson's case, which was the validity of his confinement on awaiting status before and after his disciplinary hearing, even assuming his version of the timing were correct. We agree.

documentary evidence and that correction officer Turner, unit manager Devine, unit sergeant Bailer, and inmate Antwine be called as witnesses. Hudson was provided with copies of the relevant incident reports and (at the hearing) a copy of the informant checklist; his request to examine the informant reports themselves was denied because of the risk of exposure of the informant, and his request for Antwine's medical records was denied on the ground of confidentiality. (Hudson did not, apparently, ask Antwine to waive confidentiality). His request to call Antwine was denied on the basis of security concerns, but he was permitted to submit an affidavit from Antwine (which, to the extent the almost illegible copy in the record can be deciphered, exculpated Hudson). Hudson's request for Bailer's testimony was denied because that testimony would have been cumulative of Turner's and Devine's. The hearing officer denied Hudson's request to tape record the hearing (apparently made only at the hearing) because Hudson had not taken the appropriate steps in a timely fashion under the regulations to make funds (which he sufficiently had in his savings account) available for that purpose.

The hearing took place on June 19 and 20, 1996, with Hudson in attendance. On June 20, 1996, the hearing officer issued his written decision, finding Hudson guilty, by a preponderance of the evidence (including physical evidence, observations of correction officers, and reliable and credible information from an informant with personal knowledge), of the 103 Code Mass. Regs. § 430.24(18) offense, involvement in the June 1, 1996, fight with Antwine. The other charges were dismissed. The hearing officer recommended a sanction of two weeks' loss of television, radio, canteen, and telephone privileges, all sanctions suspended for sixty days.[6] Hudson appealed the decision of the hearing officer to the superintendent, whose deputy denied the appeal. Hudson remained in the Essex I unit for approximately thirty days after the hearing officer issued his decision.[7]

Hudson's principal appellate claim is that the Superior Court

[6]From all that appears in the record, as a result of the sixty-day suspension of the disciplinary sanctions, Hudson was never actually subjected to them.

[7]Hudson's affidavit in support of his summary judgment motion avers, in conclusory fashion, that his continued confinement in Essex I was a standard punishment for those found guilty in disciplinary hearings. Nothing in the regulations or this record supports Hudson's averment. Nor does the record indicate that his continued stay in Essex I following his guilty finding was on "administrative segregation" status. The defendants assert that he remained

judge erred in not ruling that his placement in the more restrictive confinement of the Essex I unit on June 4, 1996, and his remaining there for a period of approximately six or seven weeks, constituted a violation of 42 U.S.C. § 1983, in that it denied him his Federal and State guaranteed due process rights.[8] There is no merit to his position for the simple reason that he received all process due him as a regulatory and constitutional matter.

It is clear that his placement and confinement, both before and after his disciplinary hearing, were explicitly authorized by unchallenged applicable regulations. See note 4, *supra*; 103 Code Mass. Regs. §§ 430.21(1) & 430.25(1) (1993). Contrast *Royce* v. *Commissioner of Correction*, 390 Mass. 425, 429-430 (1983); *DeLong* v. *Commissioner of Correction*, ante 353, 356-358 (1999). Moreover, he received the limited procedural safeguards required to justify the decision to place in administrative segregation an inmate who has (as Hudson asserts he does, but see discussion, *infra* at 546-548) a liberty interest: notice of the charges and an opportunity to present his position to the appropriate prison official. See *Hewitt* v. *Helms*, 459 U.S. 460, 476 (1983); *Brown* v. *Plaut*, 131 F.3d 163, 170-171 (D.C. Cir. 1997), cert. denied, 118 S. Ct. 2346 (1998).[9] See also *Daigle* v. *Hall*, 564 F.2d 884, 885-886 (1st Cir. 1977); *Johnson* v. *Fair*, 697 F. Supp. 567, 570-571 (D. Mass. 1988); *Leacock* v. *DuBois*, 937 F. Supp. 81, 83 (D. Mass. 1996); *Torres* v. *Commissioner of Correction*, 427 Mass. 611, 617-619, cert. denied, 119 S. Ct.

there only pending his appeal and the availability of a cell in Essex II, which Hudson's affidavit appears to acknowledge. In any event, had Hudson been continued on restrictive status beyond the disciplinary hearing, explicit authorization to do so could be found in 103 Code Mass. Regs. § 430.21(1), the validity of which he has not contested, and no due process violation was implicated. See note 4, *supra*, and discussion, *infra* at 544-546.

[8]Hudson does not appear to challenge the three or four days he spent in his own cell in Essex II on awaiting action status (June 1 — June 4) in either his complaint, his summary judgment affidavit, or his appellate brief. Even if he had, it would avail him naught, because of the prison officials' discretion under the regulations. See *supra* at note 4.

[9]Even under the somewhat more detailed enumeration of minimum requirements of process due a prisoner with a liberty interest affected by prison discipline set forth in *Wolff* v. *McDonnell*, 418 U.S. 539 (1974), on this record Hudson was afforded his constitutional rights, i.e., a timely written notice of the claimed violations, a written statement by the fact finders as to the evidence relied on and the reasons for the disciplinary action taken, and the opportunity to call witnesses and present documentary evidence to the extent consistent with institutional safety and security. *Id.* at 563-567.

543 (1998). In short, Hudson could lawfully be deprived of the liberty interest he asserts once the State afforded him the requisite due process. *McGuinness* v. *DuBois*, 891 F. Supp. 25, 35 (D. Mass. 1995).

Contrary to Hudson's reiterated contention (made without citation to relevant supporting authority) that his due process rights under the Massachusetts Constitution are greater than those available under the Fourteenth Amendment to the United States Constitution, his claims also fail under the State Constitution. The Supreme Judicial Court has never held that the due process provisions of our State Constitution (Part II, c. 1, § 1, art. 4; arts. 1, 10, and 12 of the Declaration of Rights) provide inmates with more extensive rights than those available under the Federal Constitution; rather, the court has consistently equated as comparable, both generally and in the prison environment, the due process protections of the two fundamental documents. See *Pinnick* v. *Cleary*, 360 Mass. 1, 14 n.8 (1971); *Zeller* v. *Cantu*, 395 Mass. 76, 83-84 (1985); *Boston* v. *Keene Corp.*, 406 Mass. 301, 308 n.8 (1989); *Carleton* v. *Framingham*, 418 Mass. 623, 630 (1994); *Hastings* v. *Commissioner of Correction*, 424 Mass. 46, 51-52 (1997); *Torres* v. *Commissioner of Correction*, 427 Mass. at 617-619 & n.11; '*Abdullah* v. *Secretary of Pub. Safety*, 42 Mass. App. Ct. 387, 390, 391, 393 (1997).

Indeed, as a matter of State law, our courts have long recognized the broad discretion of the Commissioner of Correction to transfer inmates within the prison system or within a particular institution. See *Jackson* v. *Commissioner of Correction*, 388 Mass. 700, 703 (1983); *Hastings* v. *Commissioner of Correction*, 424 Mass. at 49-50. Neither the governing statutes nor our State Constitution impose substantive standards that limit prison officials' discretion to transfer an inmate "to higher security," so long as the exercise of that discretion does "not affect the duration of . . . [his] sentence[] or subject [him] to conditions different from those customarily applied to other inmates . . . ," even if the officials' action results in the inmate "suffer[ing] a serious loss." *Hastings*, 424 Mass. at 52 (upholding against Federal and State constitutional challenge the transfer, from work-release status at pre-release facilities to imprisonment inside a correctional institution, of individuals who had had exemplary institutional and work records, a far more severe and less merited deprivation than that complained of by Hudson).

One of the "conditions . . . customarily applied" to inmates of Massachusetts prisons is, as the judge below accurately noted, the reasonable use of "awaiting action" status by correctional officials in managing their institutions, including its use in the form of administrative segregation as an investigative tool. See *Lamoureux* v. *Superintendent, Mass. Correctional Inst., Walpole*, 390 Mass. 409, 411-412 n.7 (1983). Cf. *Royce* v. *Commissioner of Correction*, 390 Mass. at 429-430 (holding that placement in "awaiting action" in an administrative segregation area is an acceptable status pending an investigation or a disciplinary hearing, but it is a temporary status and may not be used for an unreasonable or indefinite time, and keeping an inmate in it for two years without a hearing or any review was unreasonable). Being placed in administrative segregation on awaiting action status " 'is the sort of confinement that inmates should reasonably anticipate receiving at some point in their incarceration' and it does not involve an interest independently protected by the due process clause" of either the Federal or the State Constitution. *Real* v. *Superintendent, Mass. Correctional Inst., Walpole*, 390 Mass. 399, 407 (1983), vacated sub nom. *Ponte* v. *Real*, 471 U.S. 491, *S.C.*, 396 Mass. 1001 (1985), quoting from *Hewitt* v. *Helms*, 459 U.S. 460, 468 (1983).

Under the "rule of reason" by which the duration of an administrative segregation confinement on awaiting action status is tested, see *Puckett* v. *Commissioner of Correction*, 28 Mass. App. Ct. 448, 451 (1990), Hudson's situation (a total of six or seven weeks' confinement, with each stage consistent with the regulations and validated by a hearing) easily passes muster. Compare *Lamoureux* v. *Superintendent, Mass. Correctional Inst., Walpole*, 390 Mass. at 411, 413, 417-418 (no due process violation involved in inmate's being held in administrative segregation for at least thirteen and possibly as many as eighteen weeks). Contrast *Royce* v. *Commissioner of Correction*, 390 Mass. at 427, 429-430 (being held in administrative segregation for a period of over two years without a hearing or status review unreasonable); *Puckett* v. *Commissioner of Correction, supra* (restrictive detention on awaiting action status for over five and one-half months without any explanation or justification unreasonable as matter of law).

A final aspect of Hudson's due process attack on his confinement is his contention that he was denied the "fifteen day review" specified by the regulations during the approximately

thirty days he spent in Essex I following the determination of his guilt. Even assuming that his status during that period was a continuation of "awaiting action" (see note 7, *supra*) and that he received no reviews,[10] his argument is misplaced. As the regulations make clear (see note 10, *supra*), the time periods for review are made discretionary, not unmistakably mandatory, so that even under the authorities relied on by Hudson, the defendants neither violated their own regulations nor created any constitutionally protected liberty interest. Cf. *Royce* v. *Commissioner of Correction*, 390 Mass. at 428-429; *Kenney* v. *Commissioner of Correction*, 393 Mass. 28, 32-34 (1984); *Harris* v. *Commissioner of Correction*, 409 Mass. 472, 476-479 (1991); *Watson* v. *City of New York*, 92 F.3d 31, 37-38 (2d Cir. 1996); *Johnson* v. *Fair*, 697 F. Supp. at 570.

Moreover, our courts have consistently analyzed the lawfulness of a term of administrative segregation by reference to the reasonableness of its duration and the existence of valid justification for and fair process in its imposition, not merely whether regulations were technically violated or periodic reviews were omitted during the confinement. See *Royce* v. *Commissioner of Correction*, 390 Mass. at 430 & n.9; *Puckett* v. *Commissioner of Correction*, 28 Mass. App. Ct. at 451. Contrast *'Abdullah* v. *Secretary of Pub. Safety*, 42 Mass. App. Ct. at 391-392 (prison officials did not comply with regulations requiring notice of the reasons for the inmate's transfer and for the convening of a classification hearing; new hearing ordered not merely because of such noncompliance but rather because it was in fact prejudicial, i.e., it deprived the inmate of a meaningful hearing and opportunity to contest the reasons for transfer and a meaningful opportunity for administrative review of the adverse decision); *DeLong* v. *Commissioner of Correction*, *supra* at 357-358. Cf. *Martino* v. *Hogan*, 37 Mass. App. Ct. 710, 720-721 (1994) (despite prison personnel's failure to comply with regulations calling for pretransfer hearings and other procedures, "[i]t is implausible to imagine that the Legislature,

---

[10]At the time of Hudson's disciplinary woes, 103 Code Mass. Regs. § 421.08(3) provided that "[w]henever an inmate has spent 15 days on awaiting action in restrictive confinement, he shall be immediately reviewed, and every 15 days thereafter." Title 103 Code Mass. Regs. § 421.23 (1994), however, states that those time limits are "directory," i.e., advisory but not compulsory. See Webster's Third New Intl. Dictionary 641 (1993) ("directory . . . providing guidance that is advisory and authoritative but not compulsory . . . [as] opposed to mandatory").

in granting the department [of correction] authority to promulgate regulations . . . was empowering the department to create possible civil liability against the officials" who violated the regulations).[11]

In their brief, the defendants maintain that the Superior Court judge's allowance of their summary judgment motion on the due process counts of Hudson's complaint can and should be affirmed on the ground specifically relied on by the judge, namely the revised constitutional standard for evaluating inmates' due process claims set forth in *Sandin* v. *Connor*, 515 U.S. 472 (1995). In order to prove a § 1983 claim for due process violation under that decision, a prisoner must show either that he has been subjected to an "atypical and significant hardship . . . in relation to the ordinary incidents of prison life," *id*. at 484, or that the alleged deprivation "will inevitably affect the duration of his sentence." *Id*. at 487. See *Dominique* v. *Weld*, 73 F.3d 1156, 1163 (1st Cir. 1996); *Neal* v. *District of Columbia*, 131 F.3d 172, 174-175 (D.C. Cir. 1997), cert. denied, 119 S. Ct. 46 (1998). In the absence of such a showing, the Supreme Court held, a prisoner has no liberty interest giving rise to due process protections.[12]

A number of unsettled and difficult questions remain regard-

---

[11]We need not resolve, as to this aspect of the case, the conflict between Hudson and the defendants over whether his posthearing time in Essex I was (as the defendants claim) either merely biding time pending the availability of a cell in Essex II or, at most, on ordinary "awaiting action" status in connection with a disciplinary offense (the regulations regarding which do not appear to require periodic fifteen-day reviews, see 103 Code Mass. Regs. §§ 430.21[1] & 430.23 [1993]); or rather was (as Hudson appears to claim) on "departmental segregation," which entitled him to review every fifteen days. See 103 Code Mass. Regs. § 420.08(3). The record does not clearly support either position, but the issue is immaterial on our disposition of this case.

[12]Prior to *Sandin* (which was a 5-4 ruling), Supreme Court precedent called for courts to examine the language in State statutes and regulations, to determine whether it was unmistakably mandatory or merely discretionary, rather than the nature of the deprivation suffered by the inmate, in order to determine whether a liberty interest existed. See 515 U.S. at 477-481. In *Sandin*, the Court held that a prisoner's placement in strict disciplinary segregation for thirty days (on account of his physical interference with a prison officer) did not support a § 1983 claim for deprivation of due process rights under this new standard. *Id*. at 485-487. Notwithstanding the fact that Sandin's disciplinary segregation essentially amounted to solitary confinement and represented a reduction of out-of-cell time from eight to twelve hours per day to fifty minutes per day (*id*. at 486 & n.8; *Neal*, 131 F.3d at 175), the Supreme Court majority determined that such confinement "mirrored those conditions

ing how to apply the *Sandin* analysis, among them (1) what are the criteria for determining whether the restrictive hardships challenged by the prisoner are or are not "atypical and significant" deprivations; and (2) what circumstances or conditions are to be taken as representing "the ordinary incidents of prison life." See, e.g., *Wagner* v. *Hanks*, 128 F.3d 1173, 1174-1176 (7th Cir. 1997); *Brown* v. *Plaut*, 131 F.3d at 169-170; *De-Long* v. *Commissioner of Correction*, supra at 357-358.[13] See also *Sandin*, 515 U.S. at 490 n.2, 496-497 (Ginsburg, J., & Breyer, J., dissenting) (criticizing the uncertainty of the new standard); The Supreme Court, 1994 Term — Leading Cases, 109 Harv. L. Rev. 111, 144-150 (1995). In the instant case, however, we do not and need not address such issues or rest our decision upon *Sandin*[14] because, as the previous discussion demonstrates, to the extent Hudson could claim due process rights,[15] they were not violated but were rather recognized and provided. Compare *Brown* v. *Plaut*, 131 F.3d at 170-172.[16]

---

imposed upon inmates in administrative segregation and protective custody," "did not exceed similar, but totally discretionary, confinement in either duration or degree of restriction," and did not represent an atypical or significant hardship or disruption even when compared with inmates in the general population. 515 U.S. at 486. The four dissenters saw the confinement rather as effecting "a severe alteration" in the conditions of the prisoner's incarceration compared to the general population, amounting to a deprivation of liberty within the meaning of the due process clause. *Id.* at 488 & 493 (Ginsburg, J., & Breyer, J., dissenting).

[13]The defendants here syllogistically argue that no detailed factual comparison of Hudson's challenged confinement with other prison conditions is required: if solitary confinement for thirty days (as in *Sandin*) did not rise to the level of an "atypical and significant hardship," they assert, then Hudson's less severe, or at least comparable, deprivation should not give rise to a liberty interest. Given our view of the case, we need not address that contention.

[14]We can, of course, uphold a summary judgment that is legally sound on the facts presented regardless of the rationale employed by the motion judge. See *GTE Prods. Corp.* v. *Stewart*, 421 Mass. 22, 36 (1995).

[15]Hudson asserts on appeal, in a wholly conclusory and inadequate manner, see Mass.R.A.P. 16(a)(4), as amended, 367 Mass. 921 (1975), that his confinement did satisfy the *Sandin* test of atypical and significant hardship, but he devotes the bulk of his § 1983 argument and all of his reply brief to the proposition that "the Federal analys[is] in *Sandin* . . . no longer applie[s], since the State constitution provides Appellant greater protection than the Federal constitution." As discussed *supra* at 543, Hudson's position is without merit, whether or not his claims fall under the *Sandin* analysis.

[16]Whatever the impact of the *Sandin* due process analysis on inmates' constitutional arguments, the majority decision noted that prisoners, "of course

Hudson's remaining contentions require only brief discussion:

(1) His claim that, at some unspecified point during his challenged confinement, he was denied exercise for seventeen days is contradicted by the record.[17] It is also devoid of factual support for the requisite showings, under the Eighth Amendment to the United States Constitution and art. 26 of the Declaration of Rights (both of which he invoked below), that (even assuming his assertion to be true) the defendants acted in this regard with deliberate indifference to the claimed unlawful conditions and that those conditions constituted extreme deprivation and the unnecessary and wanton infliction of pain grossly disproportionate to the severity of his offense. See *Rhodes* v. *Chapman*, 452 U.S. 337, 347 (1981); *Helling* v. *McKinney*, 509 U.S. 25, 36 (1993); *Farmer* v. *Brennan*, 511 U.S. 825, 834 (1994); *Miga* v. *Holyoke*, 398 Mass. 343, 349-351 & n.9 (1986); *Torres* v. *Commissioner of Correction*, 427 Mass. at 613-616.[18]

(2) Hudson attacks, on unspecific due process grounds, a number of supposed flaws in his disciplinary hearing. His challenges do not, however, undermine the decision below, which rejected them on the basis of the defendants' compliance with all applicable regulations.[19] His request to tape record the hearing clearly failed to comply with 103 Code Mass. Regs.

retain other protection from arbitrary [or invidious] state action even within the expected conditions of confinement. They may invoke the First and Eighth Amendments and the Equal Protection Clause of the Fourteenth Amendment where appropriate, and may draw upon internal prison grievance procedures and state judicial review where available." *Sandin*, 515 U.S. at 487 n.11. See *Vitek* v. *Jones*, 445 U.S. 480, 493 (1980).

[17]In his verified complaint and his memorandum and affidavit in support of his cross motion for summary judgment, Hudson stated that in Essex I he was provided with up to ninety minutes each day for exercise or recreation, as well as the opportunity to exercise outdoors every four days. The judge could well have rejected his claim as to being totally deprived of exercise on the basis of this contradictory evidence alone.

[18]Hudson also asserts that the supposed deprivation of exercise was illegal under Department of Public Health regulations applicable to correctional facilities. He fails, however, to demonstrate by reference to any authority that the violation of such regulations creates a private right of action for affected inmates. See Mass.R.Civ.P. 16(a)(4), as amended, 367 Mass. 921 (1975). See also *Martino* v. *Hogan*, 37 Mass. App. Ct. at 720 (no civil liability for violation of State regulations).

[19]The judge also relied on *Sandin* (which we do not) on this point. Hudson actually conceded that *Sandin* foreclosed his "defective procedure" claims for Federal due process purposes and consequently again mistakenly based his

§ 430.12(3) (1993); and the use of a confidential informant's inculpatory statement at his hearing complied with the relevant provisions of 103 Code Mass. Regs. § 430.15 (1993).

(3) Hudson finally contends that the judge abused his discretion in allowing the defendants' motion for a protective order, pursuant to Mass.R.Civ.P. 26(c), as amended, 423 Mass. 1401 (1996), to stay his discovery pending a ruling on their motion to dismiss or in the alternative for summary judgment. He makes no showing, however, as is necessary, that the judge abused the broad discretion with which he is invested in dealing with protective orders, see *Merles* v. *Lerner*, 391 Mass. 221, 226 (1984); nor that even assumed abuse resulted in prejudicial error. See *Solimene* v. *B. Grauel & Co., KG*, 399 Mass. 790, 799 (1987).[20] Indeed, his entire argument is premised on the supposed constitutional right of pro se litigants to procedural indulgences — a supposition contrary to the law of this Commonwealth. See *Commonwealth* v. *Barnes*, 399 Mass. 385, 392 (1987); *Commonwealth* v. *Jackson*, 419 Mass. 716, 719-720 (1995); *Brown* v. *Commonwealth*, 424 Mass. 1019 (1997). In any event, since the protective order was sought and granted in connection with the defendants' defense of qualified immunity from suit as well as from liability, its allowance in this procedural context was well within the judge's discretion. See *Harlow* v. *Fitzgerald*, 457 U.S. 800, 817-819 (1982); *Mitchell* v. *Forsyth*, 472 U.S. 511, 526-527 (1985); *Siegert* v. *Gilley*, 500 U.S. 226, 231 (1991).[21]

*Judgment affirmed.*

---

procedural arguments on the supposedly greater protections afforded by the Massachusetts Constitution. See *supra* at 543, and the authorities there cited.

[20]Hudson failed to indicate what helpful information any discovery on his part would have produced in countering the defendants' motion. Thus, he failed to make "even a minimal showing warranting the requested discovery." *E.A. Miller, Inc.* v. *South Shore Bank*, 405 Mass. 95, 100 (1989), quoting from *MacKnight* v. *Leonard Morse Hosp.*, 828 F.2d 48, 51 (1st Cir. 1987).

[21]Hudson does not directly challenge on appeal the judge's recognition of the defendants' qualified immunity from § 1983 suit and liability on the ground that Hudson had failed to refute their showing that their conduct was (a) discretionary and (b) did not violate clearly established statutory or constitutional rights of which a reasonable person would have known. The judge's ruling in this regard appears, in any event, correct.