United States Court of Appeals

 FOR THE DISTRICT OF COLUMBIA CIRCUIT

 Argued May 6, 1999 Decided July 30, 1999 

 No. 96-7247

 Donald J. Hatch, 
 Appellant

 v.

 District of Columbia, et al., 
 Appellees

 ---------

 Appeal from the United States District Court 
 for the District of Columbia 
 (No. 94cv01393)

 ---------

 Donald J. Hatch was on the briefs for appellant.

 J. Alexander Ward, appointed by the court, argued the 
cause and filed the briefs as amicus curiae on behalf of 
appellant.

 Mary L. Wilson, Assistant Corporation Counsel, argued 
the cause for appellees. With her on the brief were John M. 
Ferren, Corporation Counsel, and Charles L. Reischel, Depu-
ty Corporation Counsel.

 Before: Silberman, Williams and Tatel, Circuit Judges.

 Opinion for the Court filed by Circuit Judge Tatel.

 Tatel, Circuit Judge: Under Sandin v. Conner, segre-
gative confinement in prison implicates a liberty interest 
protected by the Due Process Clause of the United States 
Constitution only if it "imposes atypical and significant hard-
ship on the inmate in relation to the ordinary incidents of 
prison life." 515 U.S. 472, 484 (1995). In this case brought 
by a Lorton inmate claiming a liberty interest in avoiding 
such confinement, we must define "the ordinary incidents of 
prison life"--the comparative baseline for determining wheth-
er appellant's segregation was an "atypical and significant 
hardship." Considering Sandin's language and objectives, 
we hold that due process is required when segregative con-
finement imposes an "atypical and significant hardship" on an 
inmate in relation to the most restrictive conditions that 
prison officials, exercising their administrative authority to 
ensure institutional safety and good order, routinely impose 
on inmates serving similar sentences. For appellant, these 
conditions include the usual conditions of administrative seg-
regation at Lorton. They also include more restrictive condi-
tions at other prisons if it is likely both that inmates serving 
sentences similar to appellant's will actually be transferred to 
such prisons and that once transferred they will actually face 
such conditions. Because the district court did not apply this 
standard, we reverse its grant of summary judgment for 
appellee and remand for further consideration of appellant's 
due process claim in light of this opinion.

 I

 Appellant Donald Hatch is a District of Columbia convict 
serving multiple sentences for armed robbery, kidnapping, 
sodomy, and rape. The events giving rise to this suit oc-
curred while Hatch was an inmate at the Lorton Correctional 
Complex. Because the district court granted summary judg-
ment for the District, we describe the facts in the light most 
favorable to Hatch. See Fed. R. Civ. P. 56(c); DeGraff v. 
District of Columbia, 120 F.3d 298, 299-300 (D.C. Cir. 1997).

 On January 5, 1994, while working as head clerk at Lor-
ton's law library, Hatch got into a fight with another prisoner 

over the use of a copy machine. Immediately after the 
incident, the prison Housing Board, which "determine[s] ap-
propriate housing placement" to ensure prison safety and 
security, D.C. Mun. Regs. tit. 28, s 522.1 (1987), assigned 
Hatch to administrative segregation, a form of solitary con-
finement commonly used to separate disruptive prisoners. In 
addition, Hatch received a disciplinary report charging him 
with fighting, lack of cooperation, and creating a distur-
bance--all "Class II" offenses under Lorton regulations. See 
id. ss 503.1, 503.4, 503.5, 503.11.

 On January 11, Hatch appeared before the prison Adjust-
ment Board, which adjudicates charged offenses and imposes 
disciplinary penalties. See id. ss 508-515. Due to a mistake 
in the disciplinary report, the Adjustment Board dismissed all 
charges. The next day, the Housing Board met to consider 
Hatch's confinement. Finding that Hatch posed a threat to 
the orderly operation of the prison, the Housing Board rec-
ommended that he remain in administrative segregation. 
Hatch had no notice of the Housing Board meeting, did not 
attend the meeting, and had no opportunity to testify or 
present evidence.

 On January 20, the Adjustment Board, which had previous-
ly dismissed the charges against Hatch, met again to consider 
the same charges. The Adjustment Board denied Hatch's 
requests to speak on his own behalf, to cross-examine adverse 
witnesses, and to call witnesses, including the writer of the 
disciplinary report. The Board acquitted him of creating a 
disturbance and lack of cooperation, but found him guilty of 
fighting. It sentenced him to fourteen days of adjustment 
segregation, another form of solitary confinement which, un-
like administrative segregation, punishes individual inmates 
for specific, proven acts of misconduct.

 On March 21, the Housing Board, as required by Lorton 
regulations, see id. s 527.1, conducted a sixty-day review of 
Hatch's status. Determining that Hatch no longer presented 
a "management problem," it recommended that he be re-
turned to the prison's general population. Supervising offi-
cials approved this recommendation in early April, but Hatch 

remained in segregation until August 11--more than seven 
months after his initial placement in segregation. The Dis-
trict offers no explanation for this delay. Hatch claims that 
Lorton officials kept him in segregation because bed space 
was unavailable in the general population.

 Although Hatch's confinement consisted of two weeks of 
adjustment segregation and twenty-nine weeks of administra-
tive segregation, the conditions of his confinement remained 
basically the same throughout the seven months. Confined to 
his cell twenty-three and a half hours per day on weekdays 
and all forty-eight hours of the weekend, Hatch had no 
outdoor recreation and was not allowed to work or to visit the 
library, gym, health clinic, psychological services, mailroom, 
clothing and bedding exchange, or culinary unit. He had no 
access to a dentist despite four written requests to have a 
broken, decayed tooth extracted. He had no opportunity to 
wash his clothes or get a haircut. Whenever he left the cell 
block, he was transported in handcuffs and leg irons. Prison 
officials confiscated his legal papers and denied him access to 
legal telephone calls for ninety days.

 On June 24, while still in administrative segregation, Hatch 
filed suit against the District of Columbia in the United 
States District Court, alleging that his confinement in adjust-
ment and administrative segregation violated the Due Process 
Clause of the U.S. Constitution as well as D.C. regulations 
governing Lorton. The District moved to dismiss or, alterna-
tively, for summary judgment. After requesting additional 
briefing on the conditions of Hatch's confinement, the district 
court granted summary judgment for the District. See Hatch 
v. District of Columbia, No. 94-1393 (D.D.C. Oct. 11, 1996) 
("Mem. Order"). Applying Sandin v. Conner and assuming 
Hatch's description of his confinement to be true, the court 
determined that he "did not suffer an 'atypical and significant 
hardship' " compared to "the typical restrictions imposed on 
prisoners in the general population." Mem. Order at 5. It 
thus concluded that under Sandin, Hatch had no liberty 
interest in avoiding either adjustment or administrative seg-
regation. See id. at 5-6.

 Hatch appeals pro se, aided by court-appointed counsel who 
filed briefs and argued the case as amicus curiae. Our review 
is de novo. See Tao v. Freeh, 27 F.3d 635, 638 (D.C. Cir. 
1994).

 II

 Sandin v. Conner represents the culmination of a twenty-
year effort by the Supreme Court to clarify when restrictions 
imposed by prison officials on lawfully incarcerated inmates 
constitute deprivations of "liberty" within the meaning of the 
Due Process Clause. Two basic principles have guided the 
Court's effort. The first is that prison officials need "broad 
administrative and discretionary authority over the institu-
tions they manage." Hewitt v. Helms, 459 U.S. 460, 467 
(1983). Recognizing the difficulty and complexity of operat-
ing safe and effective prisons, as well as the expertise of 
prison officials, the Supreme Court has repeatedly instructed 
federal courts "to afford appropriate deference and flexibility 
to state officials trying to manage a volatile environment." 
Sandin, 515 U.S. at 482 (citing cases); see also Hewitt, 459 
U.S. at 470 ("[T]he safe and efficient operation of a prison on 
a day-to-day basis has traditionally been entrusted to the 
expertise of prison officials...."); Jones v. North Carolina 
Prisoners' Labor Union, Inc., 433 U.S. 119, 125 (1977) (re-
quiring courts to "giv[e] appropriate deference to the deci-
sions of prison administrators and appropriate recognition to 
the peculiar and restrictive circumstances of penal confine-
ment"). Accordingly, the Supreme Court has refused to 
" 'subject to judicial review a wide spectrum of discretionary 
actions that traditionally have been the business of prison 
administrators rather than of the federal courts,' " Hewitt, 
459 U.S. at 467 (quoting Meachum v. Fano, 427 U.S. 215, 225 
(1976)), making clear that the " 'withdrawal or limitation of 
many privileges and rights' " of prisoners is " 'justified by the 
considerations underlying our penal system,' " id. (quoting 
Price v. Johnston, 334 U.S. 266, 285 (1948)).

 While recognizing the need to protect prison administra-
tors' discretion and flexibility, the Supreme Court has made 

equally clear a second, countervailing principle: "[T]hough his 
rights may be diminished by the needs and exigencies of the 
institutional environment, a prisoner is not wholly stripped of 
constitutional protections when he is imprisoned for crime." 
Wolff v. McDonnell, 418 U.S. 539, 555 (1974). "There is no 
iron curtain," Wolff said, "drawn between the Constitution 
and the prisons of this country." Id. at 555-56. The consti-
tutional protections retained by prisoners include those af-
forded by the Due Process Clause against arbitrary depriva-
tions of "liberty." Some protected liberty interests flow 
directly from the Due Process Clause itself. See, e.g., Wash-
ington v. Harper, 494 U.S. 210, 221-22 (1990). Others are 
created by state laws regulating the terms or conditions of a 
prisoner's confinement. See, e.g., Board of Pardons v. Allen, 
482 U.S. 369, 376 (1987). State-created liberty interests--the 
focus of this case--have their origins in Wolff, where the 
Supreme Court held that a Nebraska prisoner had a constitu-
tionally protected liberty interest in retaining good-time cred-
its because Nebraska law "not only provided a statutory right 
to good time but also specifies that it is to be forfeited only 
for serious misbehavior." 418 U.S. at 557; see id. at 545-53 
(discussing Nebraska statutes and prison regulations). Not-
ing that "the prisoner's interest has real substance," id. at 
557, Wolff concluded that "a person's liberty is ... protected, 
even when the liberty itself is a statutory creation of the 
State" because "[t]he touchstone of due process is protection 
of the individual against arbitrary action of government." Id. 
at 558 (citing Dent v. West Virginia, 129 U.S. 114, 123 (1889)). 
Consistent with Wolff, we have recognized that D.C. prison 
regulations may give rise to constitutionally protected liberty 
interests. See, e.g., Ellis v. District of Columbia, 84 F.3d 
1413, 1415 (D.C. Cir. 1996).

 The difficult question in a case such as this is how to 
reconcile the two principles at work in Sandin--that is, how 
do we define the range of state-created liberty interests 
protected by due process without unduly constricting man-
agement prerogatives of prison officials? Prior to Sandin, 
courts struck the balance by recognizing liberty interests 
where state laws or regulations contained explicit language 

circumscribing official authority to alter the conditions of a 
prisoner's confinement. The key case was Hewitt v. Helms, 
supra, where a Pennsylvania inmate challenged the adequacy 
of proceedings that resulted in his confinement in administra-
tive segregation after a prison riot. While observing that 
administrative segregation does not implicate "an interest 
independently protected by the Due Process Clause," 459 
U.S. at 468, Hewitt found that the prisoner had a protected 
liberty interest in avoiding such segregation because state law 
"require[d] that certain procedures 'shall,' 'will,' or 'must' be 
employed and that administrative segregation will not occur 
absent specified substantive predicates--viz., 'the need for 
control,' or 'the threat of a serious disturbance,' " id. at 471-
72 (quoting 37 Pa. Code s 95.103(b)(3) (1971)). "[T]he re-
peated use of explicitly mandatory language in connection 
with requiring specific substantive predicates," Hewitt ex-
plained, "demands a conclusion that the State has created a 
protected liberty interest." Id. at 472.

 Twelve years later, Sandin abandoned Hewitt's approach 
for two reasons. First, by "encourag[ing] prisoners to comb 
regulations in search of mandatory language on which to base 
entitlements to various state-conferred privileges," the Court 
said, Hewitt's methodology "creates disincentives for States 
to codify prison management procedures in the interest of 
uniform treatment." Sandin, 515 U.S. at 481, 482. Second, 
the Court said that "the Hewitt approach has led to the 
involvement of federal courts in the day-to-day management 
of prisons, often squandering judicial resources with little 
offsetting benefit to anyone." Id. at 482. Citing cases where 
prisoners claimed liberty interests in, among other things, 
"receiving a tray lunch rather than a sack lunch," id. at 483 
(citing Burgin v. Nix, 899 F.2d 733, 735 (8th Cir. 1990)), 
"receiving a paperback dictionary," id. (citing Spruytte v. 
Walters, 753 F.2d 498, 506-08 (6th Cir. 1985)), and "not being 
placed on [a] food loaf diet," id. (citing United States v. 
Michigan, 680 F. Supp. 270, 277 (W.D. Mich. 1988)), Sandin 
made clear that "the fine-tuning of the ordinary incidents of 
prison life" is a task for prison officials, not federal courts. 
Id.

 Although Sandin rejected Hewitt's methodology, it contin-
ued to "[f]ollow[ ] Wolff [in] recogniz[ing] that States may 
under certain circumstances create liberty interests which are 
protected by the Due Process Clause." Id. at 483-84. Criti-
cally, however, the Court refocused the test for identifying 
state-created liberty interests on what it considered "the real 
concerns undergirding the liberty protected by the Due Pro-
cess Clause," id. at 483--namely, whether the state had 
deprived the prisoner of "an interest of 'real substance,' " id. 
at 480 (quoting Wolff, 418 U.S. at 557). Sandin declared that 
state-created liberty interests

 will be generally limited to freedom from restraint which, 
 while not exceeding the sentence in such an unexpected 
 manner as to give rise to protection by the Due Process 
 Clause of its own force, nonetheless imposes atypical and 
 significant hardship on the inmate in relation to the 
 ordinary incidents of prison life.
 
Id. at 484 (citations omitted). Sandin thus "shift[ed] the 
focus of the liberty interest inquiry" from "the language of a 
particular regulation" to "the nature of the deprivation," id. at 
481, or, as the Seventh Circuit put it, "from whether there 
was an entitlement [conferred by the state] to whether the 
entitlement was to some meaningful amount of liberty," Wag-
ner v. Hanks, 128 F.3d 1173, 1173 (7th Cir. 1997).

 Although clear in its intent, Sandin's test for identifying 
liberty interests protected by the Due Process Clause has 
proven easier to articulate than to apply. See Brown v. 
Plaut, 131 F.3d 163, 170 (D.C. Cir. 1997) (identifying "a 
number of unsettled questions about how to apply Sandin"). 
The central difficulty in determining whether segregative 
confinement "imposes atypical and significant hardship on the 
inmate" is how to characterize the comparative baseline--i.e., 
how to define "the ordinary incidents of prison life." Two of 
our sister circuits have looked to conditions in the general 
prison population as the comparative baseline. See Beverati 
v. Smith, 120 F.3d 500, 504 (4th Cir. 1997); Keenan v. Hall, 
83 F.3d 1083, 1089 (9th Cir. 1996). Two other circuits have 
looked to the typical conditions of administrative segregation. 

See Griffin v. Vaughn, 112 F.3d 703, 708 (3d Cir. 1997); 
Brooks v. DiFasi, 112 F.3d 46, 49 (2d Cir. 1997). Taking a 
different approach, the Seventh Circuit has defined the base-
line as the conditions of non-disciplinary segregation in a 
state's most restrictive prison. See Wagner, 128 F.3d at 1175. 
According to the Fifth Circuit, segregation never implicates a 
liberty interest unless it lengthens a prisoner's sentence. See 
Carson v. Johnson, 112 F.3d 818, 821 (5th Cir. 1997). The 
remaining circuits have applied Sandin's "atypical and signifi-
cant hardship" test, but without characterizing the compara-
tive baseline. See Bass v. Perrin, 170 F.3d 1312, 1318 (11th 
Cir. 1999); Perkins v. Kansas Dep't of Corrections, 165 F.3d 
803, 809 (10th Cir. 1999); Mackey v. Dyke, 111 F.3d 460, 463 
(6th Cir. 1997); Kennedy v. Blankenship, 100 F.3d 640, 642 
(8th Cir. 1996); Dominique v. Weld, 73 F.3d 1156, 1160 (1st 
Cir. 1996).

 We too faced this issue in Brown v. Plaut, supra, another 
due process case brought by a Lorton prisoner challenging 
his placement in administrative segregation. But there we 
found it unnecessary to decide the "difficult and unsettled 
questions of constitutional law" implicated by Sandin. 131 
F.3d at 165. Instead, we remanded the case to the district 
court to "decide, first, assuming that [the prisoner] had a 
liberty interest in avoiding administrative segregation, wheth-
er he received all the process that he was due." Id. at 172. 
"If he did," we said, "that will be the end of the matter." Id. 
Consistent with Brown, the District claims that assuming 
Hatch had a liberty interest in avoiding segregative confine-
ment, Lorton officials afforded him the process he was due. 
Based on the record before us, we disagree.

 The parties in this case agree that if Hatch had a liberty 
interest in avoiding administrative segregation, then Hewitt 
specifies the minimum procedures for placing him in such 
confinement. Those procedures include "some notice of the 
charges against him and an opportunity to present his views 
to the prison official charged with deciding whether to trans-
fer him to administrative segregation." Hewitt, 459 U.S. at 
476; see Brown, 131 F.3d at 171. Although a hearing need 
not occur prior to confinement in administrative segregation, 

it "must occur within a reasonable time following an inmate's 
transfer." Hewitt, 459 U.S. at 476 n.8. We said in Brown 
that these "requirements are not elaborate, but they are real, 
and must be strictly complied with." 131 F.3d at 171.

 Hatch alleges in his pro se complaint that he received no 
notice of the January 12, 1994 Housing Board hearing, that 
he was not allowed to attend the hearing, and that he had no 
opportunity to present witnesses or evidence. The District 
nowhere disputes these allegations, arguing instead that a 
subsequent exchange of letters between Hatch and Lorton 
officials afforded him due process under Hewitt. See 459 
U.S. at 476 (noting that "[o]rdinarily a written statement by 
the inmate" will suffice to allow him to present his views). 
The record provides no support for the District's claim. The 
first acknowledgment of Hatch's letters by a prison official 
did not occur until February 28, over seven weeks after his 
initial placement in administrative segregation and over six 
weeks after the Housing Board hearing which Hatch did not 
attend--hardly "a reasonable time following [his] transfer." 
Id. at 476 n.8. Moreover, nothing in the record shows that 
prison officials even considered the claims Hatch raised in his 
letters. The facts of this case are thus unlike those in 
Hewitt, where the Supreme Court found that a prisoner 
assigned to administrative segregation for misconduct had 
received due process because he "had an opportunity to 
present a statement to [prison officials]" at a hearing "five 
days after his transfer," id. at 477, and because he " 'had the 
opportunity to have [his] version reported as part of the 
record,' " id. (quoting prisoner's statement on misconduct 
report).

 With respect to his placement in adjustment segregation, 
Hatch argues that assuming he had a liberty interest in 
avoiding such confinement, then he was entitled to the more 
elaborate protections specified in Wolff, which include the 
opportunity "to call witnesses and present documentary evi-
dence in his defense." 418 U.S. at 566. Disagreeing with 
Hatch, the District claims that Wolff is inapplicable because 
that case involved an inmate's loss of good-time credits, a 
deprivation more substantial than Hatch's segregative con-

finement. We need not decide the applicability of Wolff, 
however, because we think it safe to say that whatever 
procedures are required for placing an inmate in disciplinary 
segregation (again, assuming a liberty interest in avoiding 
such confinement), they must at least encompass the Hewitt 
procedures that the District says are required for placing an 
inmate in administrative segregation. The record in this case 
shows that Lorton officials failed to meet those standards, i.e., 
they gave Hatch no "opportunity to present his views to the 
prison official charged with deciding whether to transfer him 
to ... segregation." 459 U.S. at 476. According to Hatch's 
complaint, at the January 20, 1994 Adjustment Board hear-
ing, he "was not allowed to have any witnesses, ... was not 
allowed to have the writer of the [disciplinary] report present, 
to testify, [and] was [not] allowed to give any testimony on 
the record." Amended Compl. at 1. The District challenges 
none of these allegations.

 The District claims that the availability of habeas corpus in 
the D.C. courts satisfies Hewitt's procedural requirements. 
But we doubt that resolution of a habeas claim would "occur 
within a reasonable time following an inmate's transfer" to 
segregation, as Hewitt requires. 459 U.S. at 476 n.8. More-
over, given Sandin's emphasis on preserving the administra-
tive authority of prison officials, we are reluctant to shift 
primary responsibility for ensuring compliance with the Due 
Process Clause from Lorton administrators to D.C. judges.

 Thus, because Hatch did not receive the process required 
by Hewitt, and because Hatch might have persuaded Lorton 
officials to reduce his time in segregation had he had a fair 
opportunity to present his views, we cannot resolve this case 
by taking the approach we followed in Brown.

 The District suggests a second way we might decide this 
case without applying Sandin's "atypical and significant hard-
ship" test. According to the District, Sandin's test supple-
ments Hewitt's, requiring Hatch to show not only that his 
segregative confinement was an "atypical and significant 
hardship," but also that D.C. statutes or regulations had 
created an expectation that Lorton prisoners would not face 
such segregation absent certain substantive predicates. 

Claiming that Lorton regulations created no such expectation, 
the District argues that for this reason alone, Hatch had no 
protected liberty interest in avoiding segregative confine-
ment.

 We see no need to decide whether Sandin's test supple-
ments or supplants Hewitt's, for we disagree with the District 
that D.C. regulations governing Lorton contain no standards 
or guidelines limiting official discretion to place prisoners in 
segregative confinement. Those regulations make clear that 
before prison officials may place an inmate in administrative 
segregation, "there shall be a finding made that: (a) There is 
a clear and present threat to the safety of the resident; (b) 
The resident poses a clear and present threat to the safety of 
others; or (c) The resident poses a definite escape risk." 
D.C. Mun. Regs. tit. 28, s 521.4; see also id. ss 522.3, 531.2. 
The regulations also require Lorton officials to review an 
inmate's placement in administrative segregation every thirty 
days, see id. s 527.1, and "[a]t each thirty-day review, it shall 
be the responsibility of the Board to determine whether the 
resident's return to the general population at the time of that 
particular review still poses an escape risk or security risk to 
the resident or others," id. s 527.2. The regulations autho-
rize adjustment segregation only after an inmate has been 
found guilty of violating Lorton's Code of Offenses, see id. 
ss 505.1-505.3, 515.1, and they limit the term of adjustment 
segregation for inmates found guilty of Class II offenses to 
fourteen days, see id. s 505.2(c).

 Like the Pennsylvania statute at issue in Hewitt, the D.C. 
regulations governing segregative confinement at Lorton thus 
contain the "repeated use of explicitly mandatory language in 
connection with requiring specific substantive predicates" that 
prior to Sandin would have "demand[ed] a conclusion that the 
State has created a protected liberty interest." Hewitt, 459 
U.S. at 472. Therefore, even assuming (as the District 
argues) that Hewitt's test survives as an independent ground 
for denying the existence of protected liberty interests, we 
cannot avoid the key question at the heart of this case: Was 
Hatch's seven-month confinement in adjustment and adminis-

trative segregation an "atypical and significant hardship ... 
in relation to the ordinary incidents of prison life"?

 III

 Answering this question requires us to define the compara-
tive baseline--"ordinary incidents of prison life"--with speci-
ficity. Hatch argues that the proper baseline is the most 
restrictive form of confinement that Lorton officials may 
impose in their unfettered discretion. Claiming that Lorton 
officials have no discretionary authority to impose any form of 
confinement other than assignment to the general population, 
Hatch argues that comparing the conditions he faced in 
segregation to those faced by prisoners in the general popula-
tion shows that he suffered an "atypical and significant 
hardship."

 We faced this same issue in Neal v. District of Columbia, 
131 F.3d 172 (D.C. Cir. 1997), yet another case brought by a 
Lorton prisoner challenging his confinement in administrative 
segregation under the Due Process Clause. But in that case, 
we had no need to decide whether the proper test under 
Sandin "is to compare [the] circumstances [the inmate faced 
in segregation] to those of the general prison population" 
because we found that even assuming that to be the proper 
comparison, the inmate had not suffered an "atypical and 
significant hardship" within the meaning of Sandin. Id. at 
175. Apart from the loss of work and other privileges, 
administrative segregation cost the inmate in Neal only "half 
of his out-of-cell time." Id. In contrast, when Lorton offi-
cials transferred Hatch from the general population to segre-
gative confinement, he lost not only his work privileges and 
his access to the gym, library, mailroom, health services, and 
other facilities, but also more than 95 percent of his out-of-cell 
time. Indeed, Hatch claims that while in the general popula-
tion, he was confined "to being in his cell ... for only eleven 
(11) hours per day on weekdays, seven (7) hours per day on 
Friday, and Saturday nights, and the night before legal 
holidays." Hatch Br. at 6 (filed pro se Aug. 7, 1995); cf. 
Roach Aff. p 3 (affidavit of Lorton warden) (prisoners in 

general population "are locked down in their cells a total of at 
least nine (9) hours per day"). While in segregation, by 
comparison, he "was confined to a cell for twenty three and 
one half (231/2) hours per day" and all forty-eight hours of the 
weekend. Hatch Br. at 6, 10. In addition, prisoners in the 
general population "are free to move from place to place 
within the prison complex by way of a movement pass or 
under Correctional Officer supervision," "are allowed a mini-
mum of one hour of recreation time daily," "may engage in 
Group Programs, recreation and religious activities daily," 
and "have daily access to the telephone between the hours of 
6:00 A.M. and 12:00 Midnight." Roach Aff. p 3. Hatch "was 
forced to [wear] hand cuffs and leg irons whenever he left 
[the segregation cell block]," Hatch Br. at 9, "was not afford-
ed any outside recreation at all," id. at 10, was isolated from 
all other inmates when allowed out of his cell, see id., and 
received no legal telephone calls for ninety days, see id. at 11. 
We think these differences in confinement conditions fore-
close the approach we took in Neal, requiring us now to 
decide whether, as Hatch argues, conditions in the general 
population form the proper baseline for Sandin's "atypical 
and significant hardship" test. Cf. infra at 20 (explaining 
that the district court misread Sandin in concluding that 
Hatch suffered no "atypical and significant hardship" com-
pared to conditions in the general population).

 Hatch claims that his proposed baseline follows directly 
from the Supreme Court's application of the "atypical and 
significant hardship" test in Sandin itself. Concluding that 
the thirty-day disciplinary segregation of a Hawaii prisoner 
"did not present the type of atypical, significant deprivation in 
which a State might conceivably create a liberty interest," 
Sandin said:

 The record shows that, at the time of [the inmate's] 
 punishment, disciplinary segregation, with insignificant 
 exceptions, mirrored those conditions imposed upon in-
 mates in administrative segregation and protective cus-
 tody.... Thus, Conner's confinement did not exceed 
 similar, but totally discretionary, confinement in either 
 
 duration or degree of restriction.... Based on a com-
 parison between inmates inside and outside disciplinary 
 segregation, the State's actions in placing him there for 
 30 days did not work a major disruption in his environ-
 ment.
 
515 U.S. at 486 (footnotes omitted). Hatch reads this pas-
sage--in particular, the words "totally discretionary"--to 
mean that "the ordinary incidents of prison life" consist of the 
most restrictive confinement conditions that prison officials 
may impose in their unfettered discretion. According to 
Hatch, while this theory meant that conditions in administra-
tive segregation or protective custody comprised the proper 
baseline in Sandin, here it means that conditions in the 
general population should serve as the baseline because that 
is the only form of confinement Lorton officials have unfet-
tered discretion to impose.

 We disagree with Hatch's reading of Sandin. As Hatch 
recognizes, the phrase "similar, but totally discretionary, con-
finement" in the quoted passage refers to "administrative 
segregation and protective custody." At the time of the 
events giving rise to Sandin, Hawaii prison officials did not 
have unfettered discretion to place inmates in administrative 
segregation or protective custody. State regulations autho-
rized administrative segregation

 (1) Whenever the facility administrator or a designated 
 representative determines that an inmate or ward 
 has committed or threatens to commit a serious 
 infraction.
 
 (2) Whenever the facility administrator or a designated 
 representative, considering all the information avail-
 able, incuding [sic] confidential or reliable heresay 
 [sic] sources, determines that there is reasonable 
 cause to believe that the inmate or ward is a threat 
 to: (A) Life or limb; (B) The security or good 
 government of the facility; (C) The community.
 
 (3) Whenever any similarly justifiable reasons exists 
 [sic].
 
Haw. Admin. Rule s 17-201-22 (1983). Hawaii regulations 
also provided:

 Admission to protective custody may be made only where 
 there is reason to believe that such action is necessary or 
 the inmate or ward consents, in writing, to such confine-
 ment. Protective custody is continued only as long as 
 necessary except where the inmate or ward needs long 
 term protection and the facts requiring the confinement 
 are documented.
 
Id. s 17-201-23. These regulations did not authorize prison 
officials to impose administrative segregation or protective 
custody for no reason at all. Because the Sandin Court was 
fully aware of these regulations, see 515 U.S. at 476 n.2 (citing 
Haw. Admin. Rule ss 17-201-22, 17-201-23), we believe its 
use of the words "totally discretionary" cannot mean that 
what prison officials may do in their unfettered discretion is 
the touchstone for elucidating "the ordinary incidents of 
prison life."

 To be sure, Sandin nowhere directly explains why it used 
administrative segregation as the comparative baseline. But 
given the objectives Sandin sought to further, see supra at 
5-6, we think the reason is not that such confinement is 
literally "totally discretionary," but rather that prison officials 
routinely impose such confinement for non-punitive reasons 
related to effective prison management. Support for this 
interpretation comes from what the Court said in Hewitt 
about administrative segregation:

 It is plain that the transfer of an inmate to less 
 amenable and more restrictive quarters for nonpunitive 
 reasons is well within the terms of confinement ordinarily 
 contemplated by a prison sentence. The phrase "admin-
 istrative segregation," as used by the state authorities 
 here, appears to be something of a catchall: it may be 
 used to protect the prisoner's safety, to protect other 
 inmates from a particular prisoner, to break up potential-
 ly disruptive groups of inmates, or simply to await later 
 classification or transfer. See 37 Pa. Code ss 95.104 and 
 95.106.... Accordingly, administrative segregation is 
 
 the sort of confinement that inmates should reasonably 
 anticipate receiving at some point in their incarceration.
 
459 U.S. at 468. Like the Pennsylvania regulations in Hewitt, 
the Hawaii regulations in Sandin and the D.C. regulations in 
this case make clear that administrative segregation functions 
as a "catchall," a flexible management tool for ensuring safety 
and good order in prison. See Haw. Admin. Rule ss 17-201-
22 to -24; D.C. Mun. Regs. tit. 28, s 521. Given Sandin's 
insistence on affording "appropriate deference and flexibility 
to state officials trying to manage a volatile environment," 515 
U.S. at 482, it makes sense that the Court would treat 
administrative segregation as an "ordinary incident of prison 
life." Such a baseline for identifying constitutionally protect-
ed liberty interests ensures that "the day-to-day management 
of prisons" will remain in the hands of prison administrators, 
not federal judges. Id.

 Reading Sandin to require that we look to conditions in 
administrative segregation as the proper baseline does not 
end our analysis. Sandin took two additional factors into 
account. First, it observed that the prisoner's confinement 
"did not exceed similar ... confinement in either duration or 
degree of restriction." 515 U.S. at 486 (emphasis added); see 
id. ("[T]he State's action in placing him there for 30 days did 
not work a major disruption in his environment."). When we 
compare Hatch's confinement to administrative segregation, 
we must therefore look not only to the nature of the depriva-
tion (e.g., loss of privileges, loss of out-of-cell time) but also to 
its length in evaluating its "atypicality" and "significance." 
Second, Sandin noted that the prisoner's thirty-day disciplin-
ary segregation "was within the range of confinement to be 
normally expected for one serving an indeterminate term of 
30 years to life." Id. at 487. We read this to mean that 
"atypicality" also depends in part on the length of the sen-
tence the prisoner is serving. See id. at 485 (disciplinary 
segregation was not "a dramatic departure from the basic 
conditions of Conner's indeterminate sentence"); id. at 486 
n.9 ("[T]he conditions suffered were expected within the 
contour of the actual sentence imposed."). We have previous-
ly interpreted Sandin just this way. In Franklin v. District 

of Columbia, we said that courts must consider not only "the 
discipline involved" but also "the nature of the prisoner's 
term of incarceration" in determining "whether a prisoner's 
'liberty' is threatened." 163 F.3d 625, 634 (D.C. Cir. 1998).

 To sum up, we interpret Sandin to mean that a deprivation 
in prison implicates a liberty interest protected by the Due 
Process Clause only when it imposes an "atypical and signifi-
cant hardship" on an inmate in relation to the most restrictive 
confinement conditions that prison officials, exercising their 
administrative authority to ensure institutional safety and 
good order, routinely impose on inmates serving similar sen-
tences. We think this standard captures what Sandin means 
by the phrase "ordinary incidents of prison life." While the 
"incidents of prison life" encompass more or less restrictive 
forms of confinement depending on prison management im-
peratives, the term "ordinary" limits the comparative baseline 
to confinement conditions that prison officials routinely im-
pose. We also think our interpretation of the test is faithful 
to the principles animating Sandin: It ensures that prison 
officials have broad administrative authority to "fine-tun[e] 
the [conditions] of prison life," 515 U.S. at 483, while preserv-
ing a zone of liberty interests with " 'real substance' " protect-
ed by the Due Process Clause, id. at 480.

 We turn finally to the parties' competing claims regarding 
the significance of inter-prison inmate transfers for Sandin's 
baseline. According to Hatch, the baseline must be defined 
by reference to conditions at Lorton only. We agree with the 
District, however, that the possibility of transfer is one of the 
"ordinary incidents of prison life" for most prisoners in the 
country, including those at Lorton. See D.C. Code Ann. 
s 24-425 (1981) (giving Attorney General broad discretion to 
transfer Lorton inmates to any federal prison); cf. Meachum 
v. Fano, 427 U.S. 215, 225 (1976) (holding that transfer to 
prison with more onerous conditions does not deprive a 
prisoner of constitutionally protected liberty "as long as pris-
on officials have discretion to transfer him for whatever 
reason or for no reason at all"). At the same time, we 
disagree with the District that the possibility of transfer 

means that the baseline must consist of the most restrictive 
conditions routinely imposed on inmates in any prison nation-
wide, including conditions at the federal penitentiary at Mar-
ion, Illinois, an especially restrictive prison where all inmates 
are locked down almost the entire day.

 Sandin defined the "ordinary incidents of prison life" in 
terms of the "basic conditions" of a prisoner's sentence, 515 
U.S. at 485, the conditions "normally expected" for a prisoner 
serving a given term, id. at 487. What matters, therefore, is 
not simply the possibility of transfer but also its likelihood. 
The mere fact that the Attorney General has discretion to 
transfer a Lorton inmate to prisons like Marion does not 
make such transfers "ordinary." Properly constructed, San-
din's baseline requires not mere inquiry into the most restric-
tive conditions prison officials have legal authority to impose 
for administrative reasons, but a factual determination of the 
most restrictive conditions prison officials "ordinarily" or 
"routinely" impose.

 We thus think that to the extent Hatch might face more 
burdensome conditions at other prisons, those conditions be-
come part of the baseline only if it is likely both that inmates 
serving sentences similar to Hatch's actually will be trans-
ferred to such prisons and that once transferred they actually 
will face such conditions. If, as the District claims, conditions 
for all inmates at Marion are more burdensome than the most 
restrictive conditions at Lorton that prison officials routinely 
impose in their administrative discretion, then conditions at 
Marion would form the proper baseline under Sandin if the 
District can show that transfers to Marion are "normally 
expected" for Lorton inmates serving sentences similar to 
Hatch's. Sandin, 515 U.S. at 487. Not only does the record 
contain no information about the frequency of inmate trans-
fers from Lorton to Marion, but the District's lawyer, asked 
at oral argument "how many D.C. prisoners go to Marion," 
said, "I don't have a number, but at least one." She then 
conceded that "[p]erhaps that one prisoner alone would not 
support our argument."

 IV

 This brings us to the disposition of this case. The district 
court compared the conditions of Hatch's segregative confine-
ment (as he described them) with conditions faced by prison-
ers in the general population. See Mem. Order at 3-4. 
Finding these differences no greater than the differences in 
Sandin between that prisoner's disciplinary segregation and 
his confinement in the general population, it then concluded 
that Hatch suffered no "atypical and significant hardship." 
See id. at 5.

 To be sure, Sandin observed in dictum that "the conditions 
at Halawa involve significant amounts of 'lockdown time' even 
for inmates in the general population." 515 U.S. at 486. But 
as our earlier discussion indicates, see supra at 14-15, San-
din's holding turned on a comparison of the prisoner's con-
finement to administrative segregation: "[A]t the time of 
Conner's punishment, disciplinary segregation, with insignifi-
cant exceptions, mirrored those conditions imposed upon in-
mates in administrative segregation and protective custody." 
Id. Indeed, the Court noted that Hawaii inmates in adminis-
trative segregation receive only "one extra phone call and one 
extra visiting privilege" than inmates in disciplinary segrega-
tion. Id. at 476 n.2. The question the district court should 
have asked, therefore, is this: Were the differences between 
the conditions of Hatch's segregative confinement and the 
conditions routinely imposed on Lorton inmates serving simi-
lar sentences, including the usual conditions of administrative 
segregation, sufficiently greater than "one extra phone call 
and one extra visiting privilege" so as to constitute an "atypi-
cal and significant hardship"?

 We thus reverse the district court's grant of summary 
judgment for the District and remand for further fact-finding 
consistent with this opinion. In evaluating whether Hatch 
had a liberty interest in avoiding adjustment segregation, the 
district court should begin by determining the usual condi-
tions of administrative segregation at Lorton. It should treat 
those conditions as the baseline for evaluating whether 
Hatch's two-week adjustment segregation was an "atypical 
and significant hardship." If using that comparison the court 
finds that his adjustment segregation was "atypical and sig-

nificant," it should then take into account the possibility that 
Hatch will be transferred to other prisons. The district court 
should redefine the comparative baseline by reference to 
more restrictive conditions at other prisons if it finds that it is 
likely both that inmates serving sentences similar to Hatch's 
will actually be transferred to such prisons and that once 
transferred they will actually face such conditions. The term 
"likely," as we use it here, means not that the combination of 
events must be more probable than not, but that there must 
be a substantial chance of its occurrence.

 As to whether Hatch had a liberty interest in avoiding 
administrative segregation, the fact that routine conditions of 
administrative segregation form the proper baseline under 
Sandin does not foreclose Hatch's claim for two reasons. 
First, Hatch alleges that although twenty-nine weeks of his 
segregation were nominally "administrative," he actually 
spent his entire confinement in conditions of adjustment 
segregation. As long as this allegation remains undisputed, 
the district court should undertake the same comparative 
analysis outlined above. Second, even if the conditions Hatch 
faced were no more restrictive than ordinary conditions of 
administrative segregation, the district court should deter-
mine whether its duration--twenty-nine weeks, including 
twenty weeks after the Housing Board found that he no 
longer posed a management problem--was "atypical" com-
pared to the length of administrative segregation routinely 
imposed on similarly situated prisoners. See Brooks, 112 
F.3d at 49 ("[T]he mere fact that [state] prison regulations 
permit extended administrative segregation does not tell how 
frequently or for what durations such segregation is [actually] 
imposed.").

 So ordered.