**Ernest BROWN, Appellant,**

v.

**William M. PLAUT, Associate Director for Institutions of the District of Columbia Department of Corrections, et al., Appellees.**

**No. 96–7027.**

United States Court of Appeals, District of Columbia Circuit.

Argued Oct. 9, 1997.

Decided Dec. 16, 1997.

Daniel M. Schember, Washington, DC, argued the causes and filed the briefs for appellant. Alake Johnson–Ford, Washington, DC, entered an appearance.

Mary L. Wilson, Assistant Corporation Counsel, Washington, DC, argued the cause for the District of Columbia, with whom Jo Anne Robinson, Interim Corporation Counsel, Washington, DC, at the time the brief was filed, and Charles L. Reischel, Deputy Corporation Counsel, Washington, DC, were on the brief.

Jonathan J. Frankel, Washington, DC, argued the cause for amicus curiae American Civil Liberties Union of the National Capital Area, with whom Stephen H. Sachs and Arthur B. Spitzer, Washington, DC, were on the brief.

Before: WALD, HENDERSON and GARLAND, Circuit Judges.

Opinion for the Court filed by Circuit Judge WALD.

WALD, Circuit Judge:

This case and its companion *James Neal v. District of Columbia* were argued on the same day and before the same panel because they raise similar issues.

Ernest Brown ("Brown"), a former inmate of the District of Columbia's (the "District's") prison at Lorton, seeks damages from the District for placing him in administrative segregation, a form of custody for prisoners who present an escape risk or pose a danger to themselves or others, for ten months allegedly without due process.[1] The district court, citing *Sandin v. Conner*, 515 U.S. 472, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995), found that Brown had no liberty interest in remaining free of that deprivation, and dismissed his suit. On appeal, the District argues that we affirm on the ground cited by the district court, or on the alternative grounds that Brown should have brought this action as a habeas corpus petition or that Brown has received all the process that was due him.

The question of how to apply *Sandin* raises difficult and unsettled questions of constitutional law, which we find it unnecessary to reach. Instead, we remand to the district court to decide the narrow factual issues relating to whether Brown received all the process he was due.

### I. BACKGROUND

On the morning of October 12, 1992, Ernest Brown, then an inmate at the Occoquan medium-security facility of the District's Lorton prison, got into an argument with Corporal Parks, a prison guard, about cigarettes.[2] In the course of this dispute, he threw an "unknown substance," allegedly urine and feces, at Parks, and told him "I'm still going to get you." A search of Brown's cell disclosed a crude weapon fashioned out of a sharpened plastic toothbrush. Parks prepared a Disciplinary Report charging Brown with two offenses, Bodily Injury (presumably for throwing the "unknown substance"), and Threatening Conduct (for saying he would

1. William M. Plaut, whose name appears in the caption of this case as a defendant, is an official of the District of Columbia Department of Corrections. He is not named as a defendant in Brown's second amended complaint, which is the complaint that is at issue in this appeal; he was, however, named as a defendant in Brown's initial complaint. The defendants named in the present complaint include the District of Columbia and a number of other D.C. prison officials.

2. Because we are considering an appeal from a motion by the District to dismiss or in the alternative for summary judgment, what follows is an account of the undisputed facts, construed in the light most favorable to Brown.

"get" Parks); a copy of this report was given to Brown. The following day, Brown was notified that a hearing of the Adjustment Board (Lorton's disciplinary body) would occur on October 16 on the charge of Threatening Conduct and on a charge of Possession of Major Contraband (the weapon). On that same day, Brown was transferred from Occoquan to administrative segregation at Lorton's Maximum Security Facility.

The Adjustment Board hearing apparently never occurred. Instead, on October 15, Brown was brought before Lorton's Housing Board, a body charged with determining whether prisoners are to be placed in administrative segregation. Brown received no advance notice of this hearing, and there is nothing in the record to show what occurred at the hearing. The only evidence in the record on this issue is a Housing Board Action Sheet, which states that the reason for the hearing was "[t]o determine appropriate housing for Resident Brown, Ernest ... who was placed in the Adjustment Unit as a result of a Disciplinary Report for Fighting on October 5, 1992 and for the alleged incident involving staff on October 12, 1992." The sheet lists Brown as stating: "I don't fear for my safety. I just want to be placed somewhere where I can have access to a Law Library." It states that the Board finds Brown "to be a threat to self and others due to the alleged incident involving correctional staff," and concludes by stating that "Resident Brown assaulted Cpl. Parks."

Brown remained in administrative segregation for a total of ten months. In the medium-security unit in which he had previously been confined, he had been able to go outdoors from 8 a.m. to dusk, was permitted to move about the dormitory and interact with other inmates at all hours of the day or night, and could participate in many prison programs. In the unit in which Brown spent the first four months of his administrative segregation, by contrast, he was in solitary confinement, and was allowed to leave his cell only to meet with visitors (while shackled, handcuffed, and belly-chained), and for two hours a week of exercise in a hallway.

Brown spent the remainder of his administrative segregation in a unit in which he was in solitary confinement, but was allowed to leave his cell for two or three hours a day. At the end of this ten-month period, Brown was apparently returned to his previous custody status.

Brown filed his initial complaint in this case in April, 1993, alleging due process, free exercise, and Eighth Amendment violations. After Brown had moved successfully for appointment of counsel and for leave to file an amended complaint, the District moved to dismiss, or in the alternative for summary judgment, as to all three of Brown's claims. The district court granted the District's motion as to Brown's due process claim, but denied it as to his other two claims. (These claims, which involved Brown's rights to dental care and to attend religious services, have since been settled.) As to Brown's due process claim, the district court found that, under *Sandin v. Conner*, 515 U.S. 472, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995), Brown did not have a liberty interest in remaining free of administrative segregation, because his confinement in administrative segregation did not amount to an "atypical and significant hardship." 515 U.S. at 484, 115 S.Ct. at 2300. Brown then sought to file a second amended complaint in order to re-plead the due process claim and to add a related claim under District of Columbia law; the district court granted Brown leave to do so, but immediately dismissed the due process claim. Brown now appeals this dismissal.

## II. ANALYSIS

■ We first reject the District's contention that because success on Brown's due process claim would "necessarily imply" that the decision to place Brown in administrative segregation was invalid, Brown must bring his claim by way of habeas corpus. As to the merits of Brown's due process claim, we address first whether Brown had a liberty interest in avoiding his term in administrative segregation, and then whether he received the process he was due.[3]

---

3. The District also makes several arguments directed at Brown's claim under D.C. law. Brown correctly points out, however, that the order from which he appeals dismissed only his due

Our review is *de novo* because we are considering an appeal from a motion to dismiss or in the alternative for summary judgment. *National Taxpayers Union, Inc. v. United States*, 68 F.3d 1428, 1432 (D.C.Cir. 1995) (dismissal); *Tao v. Freeh*, 27 F.3d 635, 638 (D.C.Cir.1994) (summary judgment).

### A. Should This Action Have been Brought in Habeas Corpus?

The District argues that, if Brown prevails, this will "necessarily imply" that the District's decision to place him in administrative segregation was invalid, and claims that this means that, under *Preiser v. Rodriguez*, 411 U.S. 475, 93 S.Ct. 1827, 36 L.Ed.2d 439 (1973) and its progeny, Brown's action must be brought in habeas corpus, not through section 1983. We conclude that the District reads the *Preiser* line of cases too broadly, and so decline to require that Brown's action be brought in habeas corpus.

In *Preiser*, the Supreme Court held that prisoners seeking the restoration of good-time credits which they claimed had been unconstitutionally withdrawn must do so through habeas corpus, not through section 1983. The Court observed that the prisoners' claims were "within the core of habeas corpus in attacking the very duration of their physical confinement itself." *Id.* at 487–88, 93 S.Ct. at 1835. Congress had required exhaustion of available state remedies as a prerequisite to habeas corpus relief, the Court explained, and it would "wholly frustrate" Congress's intent to permit this rule to be circumvented through the invocation of section 1983. *Id.* at 489–90, 93 S.Ct. at 1836–37. *Preiser* said that the same rule must apply to any challenge by a state prisoner to "the fact or duration of his confinement based, as here, upon the alleged unconstitutionality of state administrative action." *Id.* at 489, 93 S.Ct. at 1836. The *Preiser* Court set clear limits to this principle, however, expressly reaffirming its previous cases holding that a section 1983 action "is a proper remedy for a state prisoner who is making a constitutional challenge to the conditions of his prison life, but not to the fact or length of his custody," *id.* at 499, 93 S.Ct. at 1841, because such actions are not at the "heart" of habeas corpus, *id.* at 498, 93 S.Ct. at 1840–41.

The Court has twice since clarified the reach of *Preiser*. In *Heck v. Humphrey*, 512 U.S. 477, 114 S.Ct. 2364, 129 L.Ed.2d 383 (1994), the Court considered a section 1983 action that sought money damages, rather than the specific relief at issue in *Preiser*. The plaintiff in *Heck* claimed that the unconstitutional acts of the defendants, who were state officials, had led to his arrest and conviction. The Court found that the plaintiff's action was analogous to a common-law action for malicious prosecution, and that the favorable-termination requirement of such actions therefore applied to the plaintiff's section 1983 action. *Heck* thus held that a plaintiff who brings a claim under section 1983 that, if established, would "necessarily imply" that a criminal conviction or sentence was unlawful must demonstrate as an element of his claim that the conviction or sentence has been reversed, expunged, invalidated, or "called into question by a federal court's issuance of a writ of habeas corpus." *Id.* at 484–87, 114 S.Ct. at 2371–73. In *Edwards v. Balisok*, — U.S. —, 117 S.Ct. 1584, 137 L.Ed.2d 906 (1997), the Court made clear that *Heck* applies in some cases in which the underlying proceeding is not a criminal conviction or sentence, applying *Heck* to an action by a prisoner who asserted that a prison disciplinary proceeding that had deprived him of good-time credits had been invalid because, *inter alia*, the decisionmaker had not been impartial. *See id.* at — – —, 117 S.Ct. at 1588–89.

We conclude, however, that Brown's suit, which challenges only his placement in administrative segregation, is not of the type to which it is appropriate to apply *Preiser* and

process claim, not his claim under D.C. law. The order specifically stated that Brown's due process claim is "separate" from his other claims and that "there is no just reason for delay of final judgment as to this claim," and directed the entry of final judgment as to that claim. The language of this order meets the standard of

Federal Rule of Civil Procedure 54(b) for dismissal of fewer than all of the claims in a case, so that Brown's appeal is properly before us. But, because Brown's D.C. law claim was never dismissed by the district court, it is not at issue in this appeal.

its progeny.[4] The Court has never deviated from *Preiser*'s clear line between challenges to the fact or length of custody and challenges to the conditions of confinement. In *Edwards*, the Court was careful to respect the distinction drawn by *Preiser*, repeatedly characterizing the plaintiff's claim as one that would "necessarily imply the invalidity of the deprivation of his good-time credits" and therefore hasten his release. —— U.S. at ——, 117 S.Ct. at 1588. *Heck*, too, observed that the damages action in that case was in effect an attack on " 'the fact or length of confinement.' " 512 U.S. at 482, 114 S.Ct. at 2369–70 (quoting *Preiser*, 411 U.S. at 494, 93 S.Ct. at 1838–39). The Court also did not question the plaintiff's invocation of section 1983 in *Sandin*, a case in which the underlying prison disciplinary proceeding affected only the plaintiff's conditions of confinement, not the duration of his sentence. *See* 515 U.S. at 487, 115 S.Ct. at 2302. *See also McCarthy v. Bronson*, 500 U.S. 136, 142, 111 S.Ct. 1737, 1741–42, 114 L.Ed.2d 194 (1991) (drawing on *Preiser*'s distinction between challenges to the fact or length of custody and challenges to conditions of confinement in construing a statutory reference to the "conditions of confinement").[5]

Moreover, *Heck*'s rationale for its favorable-termination requirement is inapplicable to the facts of this case. Brown's action may not properly be analogized to a suit for malicious prosecution, as the decision he is challenging bears little resemblance to a judicial proceeding. Decisions to place inmates in administrative segregation are subject to greatly relaxed procedural requirements, *see Hewitt v. Helms,* 459 U.S. 460, 476, 103 S.Ct.

864, 874, 74 L.Ed.2d 675 (1983) ("An inmate must merely receive some notice of the charges against him and an opportunity to present his views to the prison official charged with deciding whether to transfer him to administrative segregation"), and the Court has recognized that they are often made fairly informally, on the basis of "subjective" and "intuitive" considerations, *see id.* at 474, 103 S.Ct. at 872–73. Indeed, the administrative proceeding before the Housing Board entailed so little process that it would almost certainly be accorded no collateral estoppel effect. *See Nasem v. Brown,* 595 F.2d 801, 806–08 (D.C.Cir.1979) (holding that an administrative proceeding in which the parties were not permitted to present live witness testimony or to cross-examine opposing witnesses should not be accorded collateral estoppel effect); 18 CHARLES ALAN WRIGHT ET AL., FEDERAL PRACTICE AND PROCEDURE § 4475, at 766 (1981). One of the Court's principal concerns in *Heck* was to limit collateral attacks on final judgments, *see* 512 U.S. at 484, 114 S.Ct. at 2371; but a proceeding that is incapable of giving rise to collateral estoppel, like that at issue in this case, hardly needs to be insulated from collateral attack. Finally, were Brown required to invoke habeas corpus to challenge his placement in administrative segregation, then the same rule would presumably apply to a myriad of prison officials' other administrative decisions affecting conditions of confinement, such as visitation, mail, shower, or library privileges. Habeas corpus might conceivably be available to bring challenges to such prison conditions, as the Court observed in *Preiser*, 411 U.S. at 499, 93 S.Ct. at 1841, but *requiring* the use of habeas corpus in

4. Brown does assert that his placement in administrative segregation may have affected his opportunities for parole, and thus the length of his confinement. It is true that Brown was denied parole in August, 1993, near or shortly after the end of his term in administrative segregation. But there is no evidence that the Parole Board considered the fact that Brown had been in administrative segregation in making its decision. The Parole Board's explanation said only that Brown's "adjustment has been poor[,] he has received two Class II DRs [disciplinary reports] and been charged with assault." Thus, the Board seems to have considered only the charges of misconduct against Brown, not their consequences.

5. We recognize that one court of appeals has applied *Edwards* to a case in which the prisoner was subject only to disciplinary segregation, and not to loss of good time or any other change in the length of confinement. *See Stone–Bey v. Barnes,* 120 F.3d 718, 721 (7th Cir.1997). We have found no other court of appeals decisions reaching this conclusion, and for the reasons set out in the text, we do not find its reasoning persuasive. *See also Clarke v. Stalder,* 121 F.3d 222, 226 (5th Cir.1997) (*Preiser* and *Edwards* do not apply to actions in which "a favorable determination would not automatically entitle the prisoner to accelerated release").

such cases would extend *Preiser* far beyond the "core" of the writ that *Preiser* set out to protect. *Id.* at 487, 93 S.Ct. at 1835.

**B.** *Did Brown's Placement in Administrative Segregation Violate the Due Process Clause?*

██ Brown's placement in administrative segregation violated the Due Process Clause only if two conditions are met: Brown had a liberty interest in avoiding that term of segregation, and Brown did not receive the process he was due. The first of these questions raises difficult issues of constitutional law; the second, only narrow questions of fact. We therefore discuss the first question only to the extent necessary to explain why we do not decide it, and focus on the second.

### 1. *Did Brown Have a Liberty Interest?*

In *Sandin v. Conner*, 515 U.S. 472, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995), the Supreme Court reworked the framework for analyzing whether a prisoner has a state-created liberty interest in avoiding a particular deprivation. Before *Sandin*, this question was answered in much the same way as were questions about the existence of other liberty or property interests: if state laws or regulations contained language constraining the discretion of state officials, a liberty interest existed. *See, e.g., Hewitt*, 459 U.S. at 471–72, 103 S.Ct. at 871–72. The *Sandin* Court found that this approach had given states "disincentives to ... codify prison management procedures" and led to the inappropriate "involvement of federal courts in the day-to-day management of prisons." 515 U.S. at 482, 115 S.Ct. at 2299. It therefore found that, although "States may under certain circumstances create liberty interests which are protected by the Due Process Clause," "these interests will generally be limited to freedom from restraint which ...

imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Id.* at 484, 115 S.Ct. at 2300.

Applying *Sandin* to this case presents a number of difficulties. First, although *Sandin* clearly dictates that we compare the hardship experienced by the inmate to "the ordinary incidents of prison life," it is not clear which prison or part of a prison is to provide the standard of comparison. At various points in *Sandin*, the Court compared the prisoner's conditions in disciplinary segregation in Hawaii's Halawa Correctional Facility to "administrative segregation and protective custody" in that prison, to the "general population" of that prison, and to an undefined "range of confinement to be normally expected for one serving an indeterminate term of 30 years to life." *See Sandin*, 515 U.S. at 486–87, 115 S.Ct. at 2301–02.

The District suggests that, because the Attorney General has authority to transfer persons convicted in the District to any other prison nationwide, the appropriate baseline for our analysis is in fact the most rigorous prison in the nation.[6] The parties have not addressed, however, what may be a prerequisite to such an argument: evidence that such transfers are "totally discretionary," a point the *Sandin* Court found important in determining that it was appropriate to use conditions in administrative segregation and protective custody at Halawa as a baseline for comparison. *See* 515 U.S. at 486, 115 S.Ct. at 2301. At least one court has accepted a variant of this argument: the Seventh Circuit has found that, because inmates may be transferred within the Indiana prison system, the test of whether a deprivation is "atypical and significant" turns on a comparison with conditions in the state's most rigorous prison. *Wagner v. Hanks*, 128 F.3d 1173 (7th Cir. 1997).[7] The *Wagner* court also noted that,

---

6. The courts of the District of Columbia have construed sections 24–402 and 24–425 of the D.C.Code to permit inmates to be transferred to state as well as to federal institutions. *See Vaughn v. United States*, 579 A.2d 170, 173 (D.C. 1990).

7. Judge Posner, the author of *Wagner*, also observed that under the panel's reading of *Sandin* "the right to litigate disciplinary confinements

has become vanishingly small." *Id.* at 1175. He added that "[t]his is a harsh result and perhaps the Court did not actually intend it," and acknowledged that while the *Sandin* Court cited cases involving prison transfers, "it did not draw the logical inference [that the baseline should be a state's most rigorous prison] and may not have intended to push its approach to its logical extreme...." *Id.* at 1176. And he further noted

because Indiana can transfer its prisoners out of state, the proper standard of comparison may in fact be the most rigorous prison in the nation; it declined, however, to "decide whether logic should be pressed so far," and remanded the case for further fact-finding. *Id.* at 1176.

Even were we to reject the District's transfer argument, we would still face a number of unsettled questions about how to apply *Sandin* to this case. Caselaw from the Second and Ninth Circuits suggests that whether a term in segregation amounts to an "atypical and significant" deprivation turns on its length and on a comparison of conditions in segregation and in the prison's general population. *See, e.g., Brooks v. DiFasi,* 112 F.3d 46, 48–49 (2d Cir.1997); *Keenan v. Hall,* 83 F.3d 1083, 1089 (9th Cir.1996). Other courts have not adopted so structured an analysis; for instance, the Fifth Circuit has concluded that a term in administrative segregation was not "atypical and significant" without discussing conditions in the segregation unit or the length of the segregation at all. *See Luken v. Scott,* 71 F.3d 192, 193 (5th Cir.1995), *cert. denied,* —— U.S. ——, 116 S.Ct. 1690, 134 L.Ed.2d 791 (1996). Were we to follow the approach of the Second and Ninth Circuits, we would then need to decide whether the length and severity of the deprivation Brown experienced sufficed to render that deprivation "atypical and significant," a close and difficult question. *Compare Sealey v. Giltner,* 116 F.3d 47, 51–52 (2d Cir.1997) (remanding for specific findings on conditions of confinement in the case of an inmate held in administrative segregation for six months) *with Mackey v. Dyke,* 111 F.3d 460, 463 (6th Cir.), *cert. denied,* —— U.S. ——, 118 S.Ct. 136, —— L.Ed.2d —— (1997) (finding that a six–month term in administrative segregation was not "atypical and significant," with no discussion of conditions in segregation). And, finally, we would need to decide whether *Sandin*'s "atypical and significant" test merely supplements *Hewitt*'s test for the existence of a liberty interest, or supersedes it altogether. *See The Supreme Court, 1994 Term—Leading Cases,* 109 HARV. L.REV. 111, 147–50 (1995) (discussing this question). We

do not think it necessary or even useful to resolve so many complex and fact-specific issues in the context of this case which it may be possible to decide on far narrower grounds.

### 2. Did Brown Receive the Process He Was Due?

■ By contrast to the liberty-interest question, whether Brown received the process he was due turns on a few simple questions of fact. The decision to place an inmate who has a liberty interest in administrative segregation is subject to limited procedural safeguards. "An inmate must merely receive some notice of the charges against him and an opportunity to present his views to the prison official charged with deciding whether to transfer him to administrative segregation.... So long as this occurs, and the decisionmaker reviews the charges and the then-available evidence against the prisoner, the Due Process Clause is satisfied." *Hewitt,* 459 U.S. at 476, 103 S.Ct. at 874. This process may be conducted a reasonable time after the transfer, and may be done either orally or in writing; periodic reviews are required after the initial transfer. *See id.* at 476–77 & n. 9, 103 S.Ct. at 873–74 & n. 9.

■ Brown contends that, because his placement in administrative confinement was based on an express finding that he had assaulted a correctional officer, it was essentially disciplinary in nature, so that he is entitled to the more extensive procedural protections applied to disciplinary hearings in *Wolff v. McDonnell,* 418 U.S. 539, 563–71, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974). Although *Wolff* itself involved both discipline and the loss of good time, we have applied *Wolff* in cases in which only discipline was at issue. *See Crosby–Bey v. District of Columbia,* 786 F.2d 1182, 1185 (D.C.Cir.1986) (per curiam). But Brown has not established that his treatment was disciplinary in nature. Prison officials may appropriately place an inmate in administrative segregation if she "represents a threat to the institution's security." *Hewitt,* 459 U.S. at 474, 103 S.Ct. at 872–73. The fact that prison officials have made a finding that the inmate has committed an assault,

---

that "we would welcome clarification of the issue      by the Court," *id.* at 1176.

rather than operating on the charge or suspicion that she has done so or will do so, does not trigger *Wolff.*[8]

We therefore conclude that only the procedures required in *Hewitt*—"some notice," and an opportunity for the inmate to present his views, 459 U.S. at 476, 103 S.Ct. at 873–74—apply to this case.[9] *Hewitt*'s requirements are not elaborate, but they are real, and must be strictly complied with. The present record raises two questions as to whether Brown had fair notice of the purpose and implications of the Housing Board hearing.

Brown was initially told that he would receive a disciplinary hearing on October 16 on charges of Threatening Conduct and Possession of Major Contraband. Then, on October 15, he was brought before the Housing Board. It is not clear whether Brown was told that this hearing would be his only opportunity to respond to the charges against him. With certain exceptions, D.C. regulations prohibit inmates from being held in administrative segregation for more than three days without a hearing before the Housing Board. D.C. Mun. Regs. tit. 28, §§ 521.7, 531.10 (1987). Brown might thus have assumed that the Housing Board hearing was only intended to consider his temporary placement in administrative segregation pending the Adjustment Board's decision, and that he would have an opportunity to defend himself on any charges at the Adjustment Board hearing on the following day. On remand, the district court should determine whether Brown made this mistaken assumption, and if so whether it was reasonable for him to do so in light of what he was told about the purpose of the Housing Board hearing.

It is also not clear whether Brown knew that the Housing Board hearing was intended to address charges that he had assaulted a correctional officer. Brown had only been notified of an Adjustment Board hearing on charges of Threatening Conduct and Possession of Major Contraband. He had previously received a disciplinary report charging him with Bodily Injury; the fact that this charge was apparently not to be addressed at the Adjustment Board hearing could have reasonably led him to conclude that it had been dropped.[10] Nor does the Housing Board Action Sheet that appears in the record provide any evidence as to whether Brown was told at the hearing that the Board would consider whether he had committed an assault. It records Brown only as saying that he does not fear for his safety and that he wants to have access to a law library, words that might suggest Brown thought that the hearing was about whether he himself was threatened and wished to be placed in voluntary protective custody.[11]

---

8. *Hewitt* explained the lower procedural protections associated with administrative segregation by noting that no stigma is attached to such segregation, and that it has no significant effect on an inmate's parole opportunities. *See Hewitt,* 459 U.S. at 473, 103 S.Ct. at 872. If Brown had shown that the Housing Board's finding that he had assaulted a guard was treated for parole or other purposes as equivalent to a disciplinary finding to that effect, or that administrative segregation was so widely used as a substitute for punishment that it carried the same stigma as disciplinary segregation, this might indicate that more extensive procedural protections were warranted. He has made no such showing.

9. We do not agree with Brown's further contention that *Hewitt* requires that an inmate receive *advance* notice of the charges against him. Advance notice is certainly valuable, and prison officials should provide it to inmates where possible; but *Hewitt* calls only for "some notice."
   The applicable regulations require that inmates receive written notice three days in advance of a

housing hearing, D.C. Mun. Reg. tit. 28, § 523.1 (1987), a requirement that prison officials apparently did not comply with here. If the District did violate this requirement, that would not amount to a violation of the Due Process Clause. State law supplies only the substance of a liberty interest; federal constitutional law governs the procedures that are required when it is withdrawn. *Archie v. City of Racine,* 847 F.2d 1211, 1217 (7th Cir.1988) (en banc).

10. Moreover, the D.C. regulations list Bodily Injury as a Class II offense, but Assault as a more serious Class I offense. D.C. Mun. Regs. tit. 28, §§ 502.4, 503.2 (1987).

11. The sheet also states that Brown "has signed Non–Animosity and Waiver of Protective Custody forms"; the meaning of this is unclear, but it may again be a reference to voluntary protective custody. (Brown denies that he signed the latter form.)

If Brown was not provided an accurate picture of what was at stake in the hearing, then he was not given his due process. *See Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 314–15, 70 S.Ct. 652, 657–58, 94 L.Ed. 865 (1950); *Memphis Light, Gas & Water Division v. Craft*, 436 U.S. 1, 14–15, 98 S.Ct. 1554, 1562–63, 56 L.Ed.2d 30 (1978). On the other hand, if he was advised of the charges that would be considered against him and given "an opportunity to present his views," then he was given all the process he was due. *Hewitt*, 459 U.S. at 476, 103 S.Ct. at 874. Because there is no record as to what occurred at the Housing Board hearing, we find it necessary to remand to the district court for further development of the facts surrounding this hearing.

### III. CONCLUSION

In sum, we find that *Preiser*'s distinction between challenges to the conditions of confinement and challenges to its fact or duration means that Brown's complaint was properly brought under section 1983, and need not have been brought as a habeas corpus petition. As to whether Brown's rights under the Due Process Clause were violated, we express no opinion at this time as to whether Brown had a liberty interest in remaining free of administrative segregation. Instead, we remand this case to the district court to decide, first, assuming that Brown had a liberty interest in avoiding administrative segregation, whether he received all the process that he was due under *Hewitt*. If he did, that will be the end of the matter. If he did not receive any such process, the district court may proceed to consider whether a liberty interest existed, in light of the questions identified in this opinion.

We therefore vacate the decision of the district court, and remand for further proceedings consistent with this opinion.

*So ordered.*